AO 91 (Rev. 11/11) Criminal Complaint     AUSA Kavitha J. Babu (312) 353-1980
AUSA Nicholas J. Eichenseer (312) 353-1412

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
MAY -8 2018
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

RODRIGO GODINEZ,
also known as "Gordo"

CASE NUMBER:

18 CR 279

MAGISTRATE JUDGE VALDEZ

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### COUNT ONE

On or about March 20, 2018, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally distributed a controlled substance, namely a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

### COUNT TWO

On or about April 3, 2018, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally distributed a controlled substance, namely a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

## COUNT THREE

On or about May 1, 2018, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally distributed a controlled substance, namely a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

_____
DANIEL J. WINTER
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Sworn to before me and signed in my presence.

Date: May 8, 2018

_____
Judge's signature

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and Title*

| UNITED STATES DISTRICT COURT | |
|---|---|
| NORTHERN DISTRICT OF ILLINOIS | ss |

## AFFIDAVIT

I, DANIEL J. WINTER, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice. I am currently assigned to the Chicago Field Division, and have been so assigned since December 2013. Prior to that, I was a United States Park Police Officer for approximately three years. I am currently assigned to the ATF Chicago Field Division in Chicago IL. As part of my regular duties, I investigate criminal violations of the federal firearms laws, including Title 18, United States Code, Sections 922 and 924, and federal narcotics laws, including Title 21, United States Code, Sections 841 and 846.

2. I have received training regarding, among other things, violations of federal firearms laws, at the Federal Law Enforcement Training Center. My responsibilities include the investigation of federal firearms and narcotic offenses committed by individuals and their organizations that engage in violent activity. I have personally conducted or assisted in criminal investigations involving violent organized street gangs and drug trafficking organizations, to include: the use of various types of electronic surveillance; the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, firearms trafficking, and of the laundering and concealing of proceeds from drug trafficking; surveillance; and analysis of

documentary and physical evidence. I have also testified in judicial proceedings and prosecutions for violations of federal firearms and narcotics laws. This affidavit is submitted in support of a criminal complaint alleging that Rodrigo GODINEZ, also known as "Gordo," has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging GODINEZ with distribution of cocaine, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offenses alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and in law enforcement records, review of recorded conversations, review of public records databases, and my training and experience, as well as the training and experience of other law enforcement agents.

## FACTS SUPPORTING PROBABLE CAUSE

4. In summary, and as set forth in more detail below, on or about March 20, 2018, GODINEZ sold approximately 63 grams of cocaine to an undercover law enforcement officer (the "UC"); on or about April 3, 2018, GODINEZ sold approximately 256 grams of cocaine to the UC; and on or about May 1, 2018, GODINEZ sold approximately 258 grams of cocaine to the UC.

### A. MARCH 20, 2018 COCAINE PURCHASE FROM GODINEZ

5. On March 20, 2018, at approximately 3:38 p.m., the UC sent a text message to (773) 983-7827 ("Godinez Phone 1"), "yo hit me up im close". GODINEZ,

2

who was using Godinez Phone 1, called[1] the UC at approximately 3:43 p.m. and agreed to meet the UC at an agreed upon location. GODINEZ confirmed that the UC wanted to purchase "63," meaning 63 grams of cocaine.[2]

6. At approximately 3:48 p.m., the UC departed a staging location in an undercover vehicle (a "UCV"). Both the UC and the UCV were equipped with audio/video recording equipment.

7. At approximately 4:10 p.m., according to agents conducting aerial surveillance and footage from a law enforcement surveillance camera, a man driving a Tan Toyota Highlander ("Godinez Vehicle 1") and matching GODINEZ's description went inside the coach house behind the residence on the 4400 block of S. Wolcott St., in Chicago ("Godinez Stash House") and came out approximately three minutes later.

---

[1] Law enforcement identified GODINEZ as the user of Godinez Phone 1 based on a comparison of the voice of the speaker using Godinez Phone 1 to the voice of the individual matching the appearance of GODINEZ who participated in the audio and video surveilled controlled purchases described herein. GODINEZ was identified by comparison of his appearance to that of a law enforcement booking photo.

[2] Some of the consensually recorded conversations have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from CS-3, the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation. Some of the recorded conversations contained herein are in the Spanish language. For these conversations, I have relied on draft – not final – English translations of conversations in Spanish done by HSI agents and/or interpreters.

The man got back into the Highlander and drove directly to the parking lot where, as described below, the UC and GODINEZ met several minutes later.

8. GODINEZ called the UC at approximately 4:17 p.m. and directed the UC to meet in the parking lot for a grocery store near the 1600 block of West 47th Street in Chicago, Illinois.

9. At approximately 4:20 p.m., GODINEZ, driving Godinez Vehicle 1, parked next to the UCV, walked over to the UCV, and got into the front passenger seat.

10. GODINEZ handed the UC three baggies, each containing white powder. GODINEZ said, "I passed this way, I seen it was empty that's why I told you to get the fuck out of there but these are all good little stores here and they really they got cameras but not like that not all bogus. I'm on that shit." Based on my training and experience, the UC understood GODINEZ to mean that he knew which stores had surveillance cameras.

11. The UC then told GODINEZ that the UC was waiting for GODINEZ to call the UC back last week. GODINEZ said "I fucking forgot and I told you I get so many fucking calls throughout the day. I got niggas calling me from the joint fucking all types of shit but… that's why I switch my number so much cause it cost a lot of money. They don't just let you [law enforcement] just fuckin tap phones you know what I'm saying like that you [law enforcement] gotta provide information. So I keep, I rotate. Every thirty days I fucking switch up my shit [change my phone numbers to avoid detection and possible interception by law enforcement]."

2

12. The UC then gave GODINEZ $2,200 as payment for the suspected cocaine. The three baggies weighed approximately 65 grams and later tested positive for the presence of cocaine on a field test kit.

### B. APRIL 3, 2018 COCAINE PURCHASE

13. On April 2, 2018, at approximately 3:05 p.m., the UC had a recorded phone conversation with GODINEZ, who was using (312) 686-5667 ("Godinez Phone 2"). GODINEZ confirmed that Godinez Phone 2 was his new number. The UC told GODINEZ that he had never gotten back to the UC concerning the "ticket prices" they had talked about last time, that is, the conversation the UC and GODINEZ had on or about March 20, 2018 concerning prices for four and half ounces and a quarter kilogram of cocaine.

14. That evening, at approximately 7:29 p.m., the UC had a phone conversation with GODINEZ, who was using Godinez Phone 2. GODINEZ said that the "four and a baby" [approximately four and a half ounces of cocaine] was "45" [$4,500], and that, "[i]f you get the nine [quarter kilogram of cocaine] it's a little bit cheaper my boy said." The UC asked GODINEZ if GODINEZ had a number for the quarter kilogram, to which GODINEZ replied, "I wanna say he said 85 or 86 [$8,500 or $8,600] for it. The UC and GODINEZ agreed to meet the following afternoon.

15. On April 3, 2018, at approximately 2:14 p.m., the UC had a phone conversation with GODINEZ, who was using Godinez Phone 2. The UC told GODINEZ that he wanted the "9 piece" [approximately a quarter kilogram] for 85 [$8,500]. GODINEZ replied, "alright I got you." The UC and GODINEZ agreed to meet in about an hour later.

2

16. At approximately 3:35 p.m., according to footage from a law enforcement surveillance camera, an individual driving a tan Toyota Highlander (same color and model as Godinez Vehicle 1) and matching GODINEZ's description went inside the Godinez stash house and came out approximately 19 minutes later before driving away in the Highlander. As described below, GODINEZ met the UC several minutes later, arriving in the Highlander.

17. After having several calls with GODINEZ about the meet location, at approximately 4:06 p.m., the UC parked the UCV near GODINEZ's vehicle in a supermarket parking lot on South Paulina in Chicago, Illinois.

18. At approximately 4:08 p.m., GODINEZ walked over to the UCV and got into the front passenger seat. GODINEZ handed the UC a brown plastic bag, inside of which was a clear Ziploc bag containing white powder. The UC placed the plastic bag containing the Ziploc bag in a compartment in the UCV and gave GODINEZ $8,500 in prerecorded ATF agent buy funds. GODINEZ said, "Man I wish these motherfucking hundreds were all mine ... you know how hard it is to come across fucking save the hundreds ... I usually get stuck with fucking twenties and fucking I always try and give them to the fucking man."

19. In the UCV, the UC told GODINEZ that the UC would contact him in about two weeks. Referring to the suspected cocaine, GODINEZ said, "I know you gonna break that motherfucker down [divide it up for possible resale distributions]. Make ... you know what I'm saying. You got to. That's how you eat. That's how I eat [reselling cocaine is how I support myself]. You know what I'm saying. I get my shit

2

and I break that motherfucker down. I do some re-re [combine with cutting agent to increase quantity], do some fucking bags. You know what I'm saying."

20. The Ziploc bag with the white powder weighed approximately 256 grams and later tested positive for the presence of cocaine on a field test kit.

### C. MAY 1, 2018 COCAINE PURCHASE

21. On or about April 23, 2018, at approximately 4:31 p.m., the UC placed a call to Godinez Phone 2. GODINEZ answered the call. The UC told GODINEZ the UC wanted to see if he could pick up the same thing as last time [referring to the April 3, 2018 deal] the following day. GODINEZ stated, "uh alright let me just call my guy and make sure and I'll call you back in a little bit right now and I'll fucking let you know alright."

22. The UC then called Godinez Phone 2 with no answer later on April 28, 2018, again on April 29 and April 30, 2018. Then, on or about April 30, 2018, at approximately 2:17 p.m., the UC placed a call to Godinez Phone 2. GODINEZ answered the call. The UC told GODINEZ the UC was trying to get a hold of him. GODINEZ stated, "Damn bro there ain't shit been happening bro that's why I didn't call you back my guys been giving me the run around for a couple days." the UC stated, "oh, oh you don't got nothing?" GODINEZ replied, "Nah bro that's the only reason I didn't call you back… not trying to waste your time but uh he said he was gonna call me back a little bit later when he gets off of work. He was gonna go see somebody else. So if anything I'll give you a call a little bit later probably around four or five. I'll let you know what's up alright. Cause he [his source of cocaine] don't get

2

out of work till three you know what I'm saying." The UC told GODINEZ to let the UC know and maybe the UC could come through the following day.

23. At approximately 8:50 p.m., the UC received the following text message from GODINEZ, who was using Godinez Phone 2, "We good if u want tomorrow." At approximately 9:16 p.m., the UC responded, "cool ill come thru around 3:30." GODINEZ, using Godinez Phone 2, responded "Ko." [Meaning ok.]

24. On May 1, 2018, at 3:30 p.m., the UC contacted GODINEZ on Godinez Phone 2 and the call was unanswered. At 3:34 p.m., the UC sent a text message to GODINEZ on Godinez Phone 2, and asked "we still good?" On May 1, 2018, at approximately 3:42 p.m., the UC received the following text message from GODINEZ, who was using Godinez Phone 2, "Yea."

25. At approximately 3:44 p.m., the UC placed a call to Godinez Phone 2 and GODINEZ answered. The UC told GODINEZ that the UC was about twenty minutes away and that since the UC did not hear from GODINEZ the UC was just driving around. GODINEZ stated, "OK that's cool I got you." The UC and GODINEZ agreed to meet by the restaurant at the 1600 block of W. 47th Street in Chicago. GODINEZ asked, "Same thing as last time right?" The UC confirmed that the UC wanted the same thing as last time, meaning approximately 256 grams of cocaine.

26. At approximately 4:02 p.m., the UC, who was equipped with audio/video recording devices and driving a UCV equipped with audio/video recording equipment, arrived at the parking lot of the restaurant at the 1600 block of W. 47th Street in Chicago and parked the UCV in the southeast section of the parking lot. At

2

approximately 4:03 p.m., the UC placed a call to Godinez Phone 2 to let GODINEZ know the UC had arrived. GODINEZ stated, "Alright I'll be over there."

27. At approximately 4:18 p.m., the UC observed Godinez Vehicle 1 arrive in the parking lot of the restaurant at the 1600 block of W. 47th Street in Chicago. GODINEZ was the sole occupant of the vehicle. GODINEZ parked his vehicle in a parking spot to the north of the UCV. GODINEZ exited his vehicle, walked over to the UCV and got into the front passenger seat.

28. According to the audio/video recording devices and the UC, GODINEZ handed the UC a white Walmart plastic bag. According to the UC, within the plastic bag there was a clear Ziploc bag containing white powder (suspected cocaine). GODINEZ indicated his source of supply had him waiting for a week and a half and in the meantime, GODINEZ had other people waiting to purchase cocaine from him. GODINEZ also stated that he was "dry" too and he had to grab some for himself. The UC gave GODINEZ $8,500 in prerecorded ATF funds in exchange for the suspected cocaine.

29. While in the car with GODINEZ, the UC suggested that, as opposed to meeting with GODINEZ every two weeks (to pick up a quarter kilogram), next time the UC could pick up a half (kilogram) in order to save time and money. GODINEZ indicated it was up to the UC. GODINEZ stated, "I'll text you right now, actually I'm gonna go see him [referring to his source of supply] cause I gotta give him some bread from last night and I'm gonna tell him… cause if you grab a half and I grab a half we'll just grab the whole thing. You know what I'm saying, so he'll give us a better

number so let me tell him and I'll let you know I'll let you know in a little while. I'm gonna go see him at around 6:00 and I'll let you know what he fucking tells me."

30. According to the UC and law enforcement surveillance, GODINEZ left the UCV, returned to his vehicle and exited the parking lot.

31. The Ziploc bag containing white powder, which GODINEZ gave the UC, weighed approximately 258 grams and later tested positive for the presence of cocaine on a field test kit.

## CONCLUSION

32. Based on the foregoing, I believe there is probable cause to believe that, on each of the following dates: March 20, 2018, April 3, 2018, and May 1, 2018, GODINEZ knowingly and intentionally distributed a controlled substance, namely mixtures and substances containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

DANIEL J. WINTER
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SUBSCRIBED AND SWORN to before me on May 8, 2018.

MARIA VALDEZ
United States Magistrate Judge

2